DECISION
This case was heard by the Court, without the intervention of a jury, on the counterclaim of Paul Savoie. The case was initially brought by Langdon Wilby (Wilby) and Tammy Emmett (Emmett) against Mr. Savoie to recover a sum of money in the amount of $38,000 arising from the transaction which is the subject of this suit. The original complaint had been dismissed by this Court upon an entry of a Rule 37 Motion for Judgment for the Defendant Savoie against the Plaintiffs as to the Plaintiffs' complaint for failure to follow discovery procedures in this case. Consequently, the case was heard by the Court on the Defendant Paul Savoie's counterclaim. Therefore, for the purposes of this suit, we will refer to Mr. Savoie as the Plaintiff in this matter, and Langdon Wilby and Tammy Emmett shall be referred to as the Defendants.
 I. FACTS AND TRAVEL
This case arises from a business venture that was ultimately engaged in by all parties, both Plaintiff and the Defendants in this matter, to refurbish and resurrect a race track in the State of Vermont. In early 1997, Defendants Wilby and the former husband of Defendant Tammy *Page 2 
Emmett, [1] one Marcus Vitale (Vitale), became aware of an opportunity to operate a horse racing facility at a defunct race track in Pownal, Vermont. The race track was called the Green Mountain Race Park at that time. Mr. Wilby and Mr. Vitale followed up with personal visits to the track site in Vermont, met with the owner of the property on the site who gave them an escorted tour of the premises, and introduced Wilby and Vitale to several persons in the community who were familiar with the track and its operations.
After several visits to the track and after meeting with the owner, Mr. Tiegens, Wilby and Vitale determined that they would pursue this business venture further. Because of Mr. Vitale's engagement as a horse trainer, actively dealing with horses on various race tracks in the region, it was determined that his name could not appear on any business venture of this nature, because that would create a conflict and problem for him as a horse trainer and would make it impossible for him to be able to continue in that profession. As a result, it was then determined that his then wife, Tammy Emmett, and Mr. Wilby would be formally engaged in this business venture.
Wilby and Emmett retained the services of Attorney Ralph Foote, who was familiar with the race track business and was also a former Lieutenant Governor of the State of Vermont. Mr. Foote incorporated Wilby and Emmett in the State of Vermont on July 21, 1997, under the name of Green Mountain Park, Inc. Testimony indicates that a verbal agreement was obtained with Mr. Tiegens, the owner of the track, to allow the newly formed corporation to take whatever steps may have been necessary to apply for a license from the State of Vermont to operate a horse racing facility at that location. The record is devoid of any evidence that a lease was ultimately ever signed by the parties with Mr. Tiegens, which becomes a salient circumstance in this case.
In the spring of 1997, the Defendants began to make repairs and improvements to the park and track under the direction of Marcus Vitale, who was apparently the onsite manager of *Page 3 
that facility in the early going of this construction project. Mr. Vitale testified that he was spending most of his time at the track site coordinating and supervising work on behalf of the Defendants. Both Defendants testified to numerous meetings with Attorney Foote, Mr. Tiegens, and certain local residents and representatives of the State of Vermont's Racing Commission, which was the licensing authority for the operation of a horse track in the State of Vermont, and that Mr. Savoie attended many of these meetings.
The evidence indicates, and Mr. Vitale so testified, as did Mr. Savoie, that Mr. Savoie and Mr. Vitale were acquaintances from the Pawtucket area. Mr. Savoie was a retired Pawtucket firefighter who frequented the restaurant of Mr. Wilby on occasion. The restaurant was called the Villa Rosa and was located in South Attleboro, Massachusetts. Mr. Vitale approached Mr. Savoie in early 1998 and outlined the activities that were being undertaken by Wilby and Emmett concerning the Green Mountain Park Race Track venture. Mr. Vitale testified that because of his acquaintance with Mr. Savoie, he knew that Mr. Savoie was a dog racing owner and of his interest in and enthusiasm for horse racing. Mr. Vitale also knew that Mr. Savoie was involved in the dog racing business, and that he owned and raced dogs in several states for many years.
After being briefed on the project and brought up to date by Mr. Vitale on the progress of the track, an arrangement was made to have Mr. Savoie meet with Mr. Wilby for further discussions at Wilby's restaurant concerning this Green Mountain Race Track proposal. Mr. Savoie showed interest in becoming part of the project and so testified in the trial to that fact. Mr. Vitale testified that he specifically recommended that Mr. Savoie meet with his brother Robert Savoie, who was a financial investment counselor known to the parties, prior to Mr. Savoie making a final decision as to whether or not he should join the venture. It was apparent that Mr. *Page 4 
Savoie had the wherewithal to make a somewhat substantial contribution to this venture and to become a member of the corporation. The discussion centered upon Mr. Savoie's ability to provide $500,000 in investment capital to the corporation. There is some controversy as to whether or not the Defendants Wilby and Emmett pledged $175,000 each as testified to by Mr. Savoie. Ms. Emmett and Mr. Wilby have testified that their contribution, in addition to their so-called "sweat equity" that they had already put into the project, was going to be $100,000 each, which ultimately was deposited in the corporation account. It is uncontested that all parties met with Robert Savoie to discuss the venture at his financial investment office, and after which Mr. Savoie indicated to his brother Paul Savoie that he felt that this venture was not in Mr. Savoie's interest and he urged Mr. Savoie not to engage in the activity or join the venture of race track development.
Mr. Robert Savoie did not testify at trial.
Despite Robert Savoie's advice not to join the venture, Mr. Savoie decided that he would join the venture and make the investment. Mr. Paul Savoie had indicated that he could not contribute $500,000, but was able to make a $350,000 investment for a one-third partnership interest in this venture. It is undisputed that all parties, Savoie, Wilby and Emmett, would receive a one-third partnership interest despite the disparity in the contributions made by each.
In May of 1998, Plaintiff and Defendants went to Vermont and opened a checking account at the Vermont National Bank in the name of the new corporation, Green Mountain Park, Inc. Plaintiff Savoie deposited the total sum of his $350,000 contribution, and Defendants Wilby and Emmett each deposited the sum of $100,000 for a total deposit of $550,000. All three were authorized signatories to the checking account that was therefore established. *Page 5 
Prior to Mr. Savoie's investment in the venture, the Defendants in this case had retained Paul Rizzo and Gary Owens as consultants to assist them in the preparation of the Vermont license application and to oversee and assist with the development and refurbishment of the actual track facility. Mr. Vitale, who was not a signatory to the bank account nor an active and contributing member to the corporation or a member of the corporation, was acquainted with Mr. Rizzo and Mr. Owens through his connections in the horse racing field and knew of their experience at various tracks along the East Coast of the United States.
It became aware through the testimony of the Defendants that they individually and collectively had little, if any, expertise in the running of a race track facility, or applying for a license, or to any extent managing this type of a business venture. Mr. Savoie, for his part, testified that he had visited the track prior to his investment and met with Gary Owens and had been shown the facility before he invested his contribution. The travel of the case as indicated by the Court thus far is basically a recitation of facts that is generally agreed to by all parties. The facts in this case, however, take a wide diversion from this point forward.
At the time of the initiation of the corporation filed on July 21, 1997, the incorporators were Langdon Wilby, Tammy Emmett and Ralph Foote. The first meeting of the corporation was held on April 8, 1998, and at that time Mr. Foote removed himself as an incorporator and the incorporators, the Board of Directors, and all shareholders of the corporation were present and listed as Langdon Wilby, Tamera Emmett and Paul Savoie. Each of the Directors were issued a total of 10,000 shares each, Mr. Wilby and Ms. Emmett issuance of their respective shares according to minutes shall be inclusive of any initial issue received by them for monies paid, services rendered, credit and guarantees extend and to be extended to the corporation. The *Page 6 
issuance of Mr. Savoie's shares was in consideration of his contribution of the $350,000 already paid into the corporation.
At the trial it became painfully evident that the recordkeeping, direction, organization and supervision of the refurbishment of the Vermont race track venture were shoddy at best. Marcus Vitale appeared to be the onsite director of operations. He issued checks on behalf of the corporation, signing the names of all three signatories, Paul Savoie, Tammy Emmett, and Langdon Wilby. All manner of checks were signed by Vitale for a variety of expenditures. There are ledger entries made by Mr. Vitale to account for a wide array of expenditures over a large number of checks, but there is not in evidence any bills of lading or receipts to support the payments or to whom they were made.
The complaint of Mr. Savoie in the nature of a counterclaim, which is the subject matter of this suit, sounds fraudulent; that is, the deliberate misrepresentation and omissions of information given to Mr. Savoie which were made or withheld to induce him to make the investment. A count was brought for breach of fiduciary duty in the management, expenditure in accounting of the monies expended for this venture, and negligence in the operation, direction and oversight of the corporation in violation of the duty owed to all shareholders of the corporation by its officers.
In addition to the three counts indicated, there also is a complaint for punitive damages to be awarded against the Defendants.
The Defendants in this case testified that Mr. Savoie was a willing, eager and knowledgeable participant who wanted to invest his money in this venture and one who was not induced or misled in any way. *Page 7 
 II. STANDARD OF REVIEW
The law to be applied in the determination of the outcome of this case will be the law of the State of Vermont. The race track facility was located in Vermont and the corporation was formed under the laws of and in the State of Vermont. Most of the activities concerning the race track took place in and around the facility located in the State of Vermont. While it is true that two of the participants were from Rhode Island and one from Massachusetts, the Court believes that the law of the State of Vermont should be applied to the issues in this case. Upon inspection, however, the Court is of the opinion that the laws of the State of Rhode Island and the State of Vermont in this area are extremely similar; but nonetheless, for the record, we will be applying the laws of the State of Vermont.
As in any case of this nature, the Plaintiff has the burden of proving that which he asserts or claims in the counts that have been propounded in this law suit. The standard that must be applied in this case is that the Plaintiff must prove his assertions by clear and convincing evidence with regard to the fraud and misrepresentation aspect of this complaint. Both Defendants testified either under direct examination or as adverse witnesses in each other's cases, and the Court is extremely concerned about the patent lack of recollection on the part of all of the main witnesses in this case. The Plaintiff avers that the Defendants in this case exhibited selective memory when under examination by Plaintiff's counsel, but the Court is of the opinion that all of the main witnesses in this case, Mr. Vitale, Mr. Wilby, Ms. Emmett and Mr. Savoie, were less than forthcoming in their ability to recollect and recall a series of events in the chain of events leading to this law suit. Ms. Emmett, in her defense since these matters have occurred, according to her testimony, has suffered a stroke which has interdicted her ability to recollect and *Page 8 
recall a lot of the facts involving her involvement in this case. The Court does find, however, that her involvement in this case was fairly diminished inasmuch as it is obvious that she was used as a replacement person in the corporation for her then husband, Marcus Vitale. Nonetheless, it is rather incredible that the parties in this matter could not recall significant events concerning their personal involvement in this case.
There are several areas of disagreement on rather important matters concerning the travel of this case. For instance, Mr. Savoie indicates that he only went to the race track on two or three occasions, that he may have stayed overnight once — maybe possibly twice — although he did acknowledge that he stored an antique automobile there on the premises in Vermont which he drove from time-to-time while at the race track. The testimony of Mr. Wilby and Mr. Vitale on the other hand indicate that Mr. Savoie was a constant presence at the race track facility, often staying for several days, sleeping in the jockey quarters, and performing menial tasks like getting the lunches for the work crews and going to the hardware store to pick up things that were necessary, and that he enjoyed spending time in the convenience store across the street from the race track with one of the persons who ultimately became one of the directors of the corporation, but who had no real involvement in its management.
Another salient disagreement of facts is to how many meetings were held regarding the management of the race track and the Board of Directors of the corporation, at which Mr. Savoie was present. Mr. Wilby and Mr. Vitale testified that Mr. Savoie was there on certain occasions when discussions were had regarding the withdrawal of the application for the license before the Vermont Racing Commission, while Mr. Savoie maintains that he was told that the application had been denied by the Vermont Racing Commission and had not been withdrawn by the corporation. Mr. Savoie denies that he was at a meeting at which time he was told the *Page 9 
application had been withdrawn. In addition, there is disagreement regarding the initial investment made by the parties. It was clear that Mr. Savoie made his $350,000, and it is also evident that Ms. Emmett and Mr. Wilby deposited $100,000 at the same time in the Vermont National Bank. There is an averment by Mr. Savoie that Mr. Wilby and Ms. Emmett had promised to place $175,000 each in the investment of the corporation, but only came up with $100,000. Mr. Wilby said that because of their sweat equity and working for a full year before asking Mr. Savoie to join as a joint venturer in this project, that he felt that the $100,000 was sufficient as he often made payments to benefit the venture out of his own pocket.
There are also disagreements with regard to how much time Mr. Wilby actually spent at the race track and what he did while he was there. He testified that he was often there two or three days a week while running his restaurant in Attleboro on a full time basis. The Court also finds rather incredible that Mr. Wilby, when the corporation had withdrawn its application and began to invest the remaining $100,000, could not on the stand recollect the name of the broker who invested the $100,000 for the corporation, nor could he produce any statements generated by the brokerage firm engaged by Mr. Wilby. All that Mr. Wilby could testify to is that the investments did not turn out as had been hoped for, and that the $100,000 investment had dwindled to $38,000.
There is also great disagreement as to the nature and extent of Mr. Savoie's involvement with the corporation. It doesn't appear to be a question that he was made a member of the Board of Directors upon his investment of $350,000 in March of 1998. What is in dispute is whether or not he was ever made an officer of the corporation. Mr. Wilby and Ms. Emmett have testified that he was either the Vice President or Secretary at one point or another, and papers submitted to the Vermont Licensing Board for the operation of the track listed him as Secretary. Among *Page 10 
the many mysteries in this case is that there is no corporate paperwork to indicate his appointment to any of these positions as averred by the various witnesses. Mr. Savoie, in his testimony, denies that he was ever an officer of the corporation.
We also have the testimony of Mr. Nollette, an ordained Deacon, who was called as a witness to verify the fact that Mr. Savoie could not possibly have spent long stretches in the company of Wilby and Vitale at the race track, because it was his custom to meet with Mr. Savoie at a local drinking establishment, practically on a nightly basis in Pawtucket, Rhode Island. He further testified that Mr. Savoie's mother was in a period of her last illness, and he often on short notice was able to accommodate Mr. Savoie by driving out to Mr. Savoie's mother with Mr. Savoie with communion to give to Mrs. Savoie at her residence. Despite the witness being "a man of the cloth," this Court does not give his testimony great weight because it was devoid of specifics, particularly regarding the timing and frequency of these events.
There is also great disagreement in this case regarding the knowledge that Mr. Savoie had about Mr. Vitale having the authority to write checks on behalf of the corporation, signing all of the names of the three initial members of the Board of Directors — Mr. Wilby, Ms. Emmett and Mr. Savoie. There is in evidence several checks that Mr. Savoie acknowledged that he did sign personally to be used in payment of various bills for the corporation, but there were far more in number that he acknowledged that he did not sign and denied that he had given permission to Mr. Vitale to sign his name. There are no corporate papers authorizing Mr. Vitale to take this action, and it is clear that he was never a signatory to the account in question. Mr. Wilby and Ms. Emmett have both testified that all parties — Mr. Savoie, Mr. Wilby and Ms. Emmett — were fully aware of Mr. Vitale signing their names on the checks because Mr. Vitale was onsite far more than the other three members of the Board and was operating and directing the daily operations *Page 11 
of the corporation. There is in evidence a substantial list of checks being paid to what appear to be local vendors and purveyors of goods and services in the refurbishment of aspects of the race track to account for a good deal of the money that was placed into the corporation. There is no doubt that there are some unanswered questions with regard to small loans that may have been made to one party or another during the course of this reconstruction of the race track and also the specter of the many, many checks being made out to Country Side Farms, which was the business establishment run by Mr. Vitale and his then wife, Ms. Emmett. The explanation to these expenditures were along the lines of repayment for personal funds that were used by Mr. Vitale in satisfying debts of the corporation while he was managing the facility in Vermont, however, verification of these contributions was not in evidence. There is no question that the overall management of this corporation, its bookkeeping and accounting, were very much left to be desired by the persons responsible for the corporation itself.
There was no testimony given before the Court from Gary Owens or Paul Rizzo, although many checks were issued to them for services rendered which were interestingly countersigned by Marcus Vitale after the payee, Rizzo or Owens had previously signed these pay checks. There is no question that Mr. Owens and Mr. Rizzo were hired for their purported expertise in race track management, but yet the Court was not made aware of their actual contributions from them on a first-party basis.
The entire case appears to revolve around what the Plaintiff Mr. Savoie knew, when he knew it, what he did or did not allow people to do on his behalf, and what Mr. Wilby and Ms. Emmett did without his knowledge and whether or not pertinent information as alleged by Mr. Savoie was willfully withheld from Mr. Savoie prior to his making the $350,000 investment. Also at issue in this case, and one of rather great importance, is whether or not each of the parties, *Page 12 
Mr. Wilby and Mr. Savoie were aware of each other's criminal records. The record appears to establish that Mr. Wilby had pled in the early 1970's to one count in the Federal District Court of Rhode Island of transporting stolen goods for which he received one year probation. There was not introduced into evidence any official judgment record rendered by the district court in that regard, but that seems to be the state of affairs as agreed to by Plaintiff and Defense counsel in this matter. It is also clear, again without documentation, that Mr. Savoie at some time earlier in his career had pled to obtaining money under false pretenses and actually served a sixty day jail or prison sentence in the State of Nevada. There is correspondence from Mr. Foote, the attorney for the corporation, who unfortunately has now deceased and cannot shed any light on these proceedings, that Mr. Wilby had left blank the question on the application as to whether or not he had ever been arrested. Mr. Wilby on his part testified that it was his recollection that he had never been arrested, that he just appeared in federal district court, and was placed on one year probation for that transgression. He testified that he never considered that to be an arrest or a conviction. It is certainly obvious that this opinion by Mr. Wilby is either very much misconceived or not understood by him, because if the facts are as he relates, he certainly had to have been arrested at some point, presented before the authorities, and ultimately entered a plea. Mr. Savoie, for his part, does not dodge his criminal activity but states that he mentioned his record to Mr. Wilby in the early goings before he made his investment. Mr. Wilby denies that emphatically and states that he did not know anything about Mr. Savoie's criminal record. It appears to this Court that that non-disclosure by either party on the application to the Commission in Vermont was really the fatal blow to the acceptance of the application by the Vermont Racing Commission. In the flow of correspondence introduced into evidence in this case, it is clear that the Board was ready to grant a conditional license to the corporation based *Page 13 
on a background check of the principals and other certain security questions raised by the Vermont State Police. Those latter questions seem to go to what level of participation the State Police may have had in the establishment of the track and its security procedures. It is clear, however, that in the background check of both individuals it would have been determined that they both possessed criminal records, which undoubtedly would have cast the application in a very unfavorable light before the Racing Commission. It is this Court's opinion, although denied by the parties, that that was the actual reason for its withdrawal. The stated reason that the Racing Commission required an additional $1.3 to $1.5 million investment for infrastructure on the track and drainage facilities, etc. may have played a part in their decision, but in this Court's opinion, it was a minor part totally outweighed by the spectrum of the criminal records of two of the members of the Board of Directors.
The Plaintiff in this case presents three causes of action for the Court's consideration. In Count I of his Complaint, the Plaintiff alleges negligence on the part of the Defendants due to a failure of the two Defendants Tammy Emmett and Langdon Wilby to fail to properly discharge their fiduciary duties to the Plaintiff Paul Savoie. In Count II, the Plaintiff alleges breach of contract, citing to a willful breach of contractual duties by the Defendants to the Plaintiff Mr. Savoie. Count III alleges fraud and material misrepresentation to Mr. Savoie, designed to induce him in a fraudulent manner to invest in this corporation. The breach of contract and the negligence count, whether applied to Vermont or Rhode Island law, requires that the Plaintiff prove that which he asserts by a fair preponderance of the evidence. Count III for the material misrepresentation, designed to induce the Defendant to make the investment by fraud, requires proof by clear and convincing evidence. *Page 14 
In the Plaintiff's brief he substantiates the claims made in each of these three counts by producing a litany of transgressions alleged to have been engaged in by the Defendants in this case in a knowing and material manner and designed to induce and defraud the Plaintiff Mr. Savoie into making his substantial investment. Among his averments were that the Defendants were not forthcoming to Mr. Savoie, that the Defendants misrepresented their own investment in the project stating $175,000 to Mr. Savoie when only investing $100,000, that they failed to develop an itemized budget or solicit bids or cost estimates before beginning the construction on the race track, that they presented no concrete plans to the investor except to use their alleged year-long labors to persuade the Plaintiff to invest $350,000. Plaintiff claims the Defendants did not inform the Plaintiff that the anticipated funding for the rehabilitation of the race track was between $1.3 million to $1.5 million. Defendants did disclose to the Plaintiff that there was no written lease or secured right of possession or ownership to the race track property. Plaintiff avers that by failing to secure a lease, the investors were making investments in property over which they had no legal claim or right of control. The only testimony to support any agreement between the owner of the race track, Mr. Tiegens, and the Defendants was attempted to establish an oral agreement to lease as testified to by Defendant Wilby. The Plaintiff avers that the Defendants did not disclose to the Plaintiff that Attorney Foote had warned Wilby that it mattered to the Commission whether or not applicants for a license to race in Vermont would be prejudiced by the existence of a criminal record. He further charges that the Defendants did not inform Mr. Savoie that Mr. Vitale, not Mr. Wilby, would actually run the corporation and be the onsite director of development of the race track. Plaintiff also complained that neither Wilby nor Vitale disclosed that they were high school dropouts or that neither of them had any experience in developing a race track venture, constructing a race track, or running a race track business. *Page 15 
There are several more independent averments of a similar nature that the Plaintiff alleges were not told to Mr. Savoie, designed clearly to induce him to make his investment and were introduced to substantiate the charge that there was a willful breach of contractual duties by Mr. Wilby and Ms. Emmett as officers of the corporation to their shareholder Mr. Savoie. Plaintiff alleges that the Defendants were negligent in the business operation of this race track, all pointing to these same or similar transgressions. Plaintiff also avers that no architect, accountant, or tax filings were made on behalf of the corporation, either state or federal, and that there was no subchapter S filing which would have allowed the profits and losses of a small business to be reported on the individual returns of the company shareholders. Plaintiff alleges that because this directive was not carried out, the Plaintiff was unable to report on his individual return the massive losses the company later sustained. Plaintiff also complains of no cash receipt or cash disbursement ledgers to account for the expenditure of funds, and also questions other specific checks to Mr. Rizzo and Mr. Owens that were signed by them and then countersigned by Mr. Vitale. Plaintiff also questions that there is no justification for the numerous payments made from the corporate account to Country Side Farms. Plaintiff also points to the fact that there was no substantiation from Mr. Wilby that he in fact invested the $100,000 with a broker. The Plaintiff complains that there has been no testimony regarding the identity of the broker, there has been no introduction into evidence of any statements from a brokerage house detailing what securities were purchased by the brokerage, how they faired, etc. Plaintiff further complains that this mismanagement of funds resulted in a $62,000 loss, resulting in the $38,000 remaining that was ultimately given to Plaintiff Savoie to be invested with his brother Robert Savoie, the financial advisor. It is also clear from the record that Mr. Savoie did not make that investment with his brother and in fact deposited the $38,000 in his personal account. This of course was *Page 16 
the original premise upon which this lawsuit was brought by Langdon Wilby and Tammy Emmett against Mr. Savoie to recover this $38,000. We have covered the travel of that matter infra and will not repeat it. The Defendants for their part acknowledge that a fiduciary obligation exists in a partnership and among shareholders in a close corporation, and that the corporate officers and directors owe a duty to the stockholders to act with utmost good faith. While acknowledging that to be the appropriate standard, the Defendants have averred that the Plaintiff was well aware of the uncertainty of the business venture. Defendants also aver that the Plaintiff entered into this venture willingly, voluntarily, and with his eyes wide open because of his desire to succeed in an area in which he had a great interest, that of horse racing. The record is clear that Mr. Savoie was well acquainted with the racing scene in general, having owned and raced greyhounds for a number of years in several venues around the country. Defendants aver that the Plaintiff was well aware that Mr. Wilby was a principal and main operator of a restaurant, and that Mr. Savoie had first-hand knowledge of that fact by his repeated attendance at that same restaurant. Plaintiff acknowledged that he had known Mr. Vitale since they had umpired Little League games and knew of his primary and principal occupation as a horse trainer. Plaintiff also acknowledged he had personal knowledge of Defendant Tammy Emmett's operation of a horse farm called Country Side Farms.
The Defendants argue that the Plaintiff was not only a stockholder and investor in the venture, but he knew that he was a director of the corporation, although he may or may not have ever been an officer of the corporation. Defendants aver that the Plaintiff's first-hand knowledge through his own regular visits to the track site in the summer of 1998 caused him to know exactly how the Defendants were proceeding with extensive maintenance and repair work at the *Page 17 
track, and that he was well aware and supportive of the fact that Marcus Vitale was the onsite supervisor of all these activities.
The Court has previously indicated that it would apply the Vermont law to the facts of this case, acknowledging at the same time that a review of both the Rhode Island law and the Vermont law found that they are extremely similar, if not identical. In Vermont an affirmative fraud occurs when a defendant makes "an intentional misrepresentation of an existing fact affecting the essence of the transaction, so long as the misrepresentation was false when made and known to be false by the maker, was not open to the defrauded party's knowledge, and was relied upon by the defrauded party to his damage." (Citing to Silva v.Stevens, 589 A.2d 852 (Vt. 1991)). This fraud must be proven by clear and convincing evidence per Bennington House Authority v. Bush,933 A.2d 207 (Vt. 2007). Vermont law acknowledges that it has been long recognized because of the element of intent, that positive proof of fraud is something to be had and the law will allow consideration of a wide range of circumstantial evidence so long as that evidence contributes to a rational basis for inferring the ultimate fact. (Citing to Fireman's Fund Ins. Co. v. Knutsen, 324 A.2d 223 (Vt. 1974)). The Plaintiff has listed a litany of misrepresentations both by affirmative representation and by omission that he believes are sufficient to reach the standard of proof by clear and convincing evidence that the Defendants lured the Plaintiff Mr. Savoie into this $350,000 investment by failing to make certain disclosure about their expertise, the cost of the track, the lack of experience in track management, and withholding the extent of their educational backgrounds. This Court has indicated prior in this decision that the Court was not impressed at all by the individual credibility of any of the principal witnesses, Langdon Wilby, Tammy Emmett, Marcus Vitale or Paul Savoie. The Court believes that each of these witnesses testified to their involvement in this case with a light to cast *Page 18 
each of them in the most favorable position possible. The Court is of the opinion, and finds as a fact, that all three of these principal parties, Wilby, Emmett and Savoie, met in an arms-length mutual desire to make an investment that they thought would have the possibility of reaping great rewards in an area of great interest to them,i.e., horse racing. All of the participants in this venture were mature men and women of reasonable backgrounds and varying personal experiences. None of the three possessed the knowledge, education and experience necessary to run a race track operation, redevelop a failing race track infrastructure, and meet the legal requirements for founding a corporation. This fact could not have been escaped by Mr. Savoie as he met with Ms. Emmett, Mr. Vitale and Mr. Wilby before he made his substantial investment. The Court, while acknowledging that this corporation was extremely poorly run, without adhering to common reasonable business practices of accounting, tax filing and reporting, etc., believes that Mr. Savoie as a shareholder and director, even though he may not have been a director who was intricately involved in the development of this venture, as was Mr. Wilby and Ms. Emmett, was well aware of the business venture and its pitfalls and possible reward. The Plaintiff knew that Marcus Vitale was running the operation in Vermont, and despite his protestations that he visited the track on only a few occasions, the Court is of the opinion based on the evidence that Mr. Savoie has been shading to his advantage the number of times that he was at that track. The Court finds as a fact that he was there on a far more frequent basis than he acknowledged, based on the testimony of Vitale and Wilby with regard to at least this aspect of the case. Also, it is clear that Mr. Savoie was well aware of the involvement of Paul Rizzo and Gary Owens as manager and general manager of the track facility and that he was in their company on more than one occasion. It is also clear that at least on one occasion he met with the owner of the track, nearby business persons with whom he developed some personal relationship, *Page 19 
and was well aware of the situation involving the extent of the project of developing, rehabilitating and operating the race track facility. The Court is of the strong opinion that all three of these people were spurred by a desire to turn a profit in a venture that they all enjoyed. Ms. Emmett was a horse woman running a horse farm. Her then husband, Marcus Vitale, was a horse trainer. Langdon Wilby was a person who looked like he was interested in making a dollar and thought that a race track would be a fine enterprise; and Mr. Savoie, because of his racing background with dogs and his general knowledge and maturity, obviously felt this was a fine investment as well. Mr. Savoie, it is important to note, did so against the affirmative advice of his brother, a generally admitted, qualified financial advisor, that this venture was not in his best interest. It is also interesting to note that apparently Mr. Robert Savoie did not want to invest the $38,000 when it was ultimately given to Mr. Savoie to be invested with him, and Robert Savoie advised his brother to keep it because of the losses he sustained.
 III. CONCLUSION
In any event, the Court, while it is aware of the corporate duties and the fiduciary duty of officers of corporations to their stockholders and shareholders, finds in this particular instance that all three of these stockholders and directors were pretty much in the same boat, that they all had the same desire to make this venture succeed, and that they were willing to take a flyer on a substantial investment. The Court, while it is dismayed at the lack of recordkeeping, accountancy and travel of the funds from the ledger book and checkbook, is not convinced by a fair preponderance of the evidence that these funds were misappropriated and put into anyone's pocket. The only concern the Court has is what happened to the $62,000 allegedly invested by Mr. Wilby with an unknown broker. That is extremely troublesome and goes to a great extent in *Page 20 
this Court's lack of overall confidence in Mr. Wilby's testimony in this case. Absent any hard evidence as to where that money did go, the Court is without the ability to make a determination that it was embezzled or otherwise unjustly enriched by Wilby or Ms. Emmett.
With regard to the other aspects of the case, breach of contract and general negligence, the Court finds that the Plaintiff has not proved by a fair preponderance of the evidence that these matters occurred, even though there was a duty owed to him as a shareholder. The Court makes this determination because this was a closely held corporation; all of the parties had the same level of knowledge, that despite the fact that there is some disagreement as to what Mr. Savoie knew about the ongoing costs of the venture that Mr. Wilby did not tell him, although Mr. Wilby denies this, that it would take between $1.3 million and $1.5 million, it is clear to this Court and the Court finds as a fact that Mr. Savoie was a knowing, willing, mature participant in what was undoubtedly known by him to be a reasonably risky and costly venture.
Also, the failure to disclose on the application for the license that either Mr. Wilby or Mr. Savoie had a criminal record was in this Court's opinion absolutely fatal to the success of this venture. The Court is of the opinion and finds as a fact that Mr. Savoie did not inform Mr. Wilby that he did have a criminal record in his casual conversation with him leading up to his investment, and it is equally clear that Mr. Wilby did not inform Mr. Savoie that he possessed a criminal record. It is also obvious to the Court that Mr. Wilby knew or should have known that his criminal record would have caused a problem for the application, whether or not he knew about the existence of Mr. Savoie's criminal record at the time the application was made. Therefore, the Court finds as a fact and as a matter of law that Mr. Savoie was a willing participant in the venture and that there was no material misrepresentations of fact or omissions of fact concerning Mr. Savoie's participation that were knowingly designed to induce him to *Page 21 
invest $350,000. The Court finds as a fact that after reasonable discussions at a level and depth of detail that Mr. Savoie felt appropriate, he made the investment and went along with the venture as did the other two shareholders.
With regard to the breach of contract of fiduciary duties, while certainly the standard of corporate accountability was not adhered to, Mr. Savoie was well aware of that fact, he was well aware that Mr. Vitale was signing his name, he was well aware that there were payments being made to others, aside from vendors at that location. The Court finds as a fact that the Plaintiff has failed to prove by a fair preponderance of the credible evidence that the Defendants were negligent as to him and the operation of the corporation, and that the Plaintiff has failed to establish that the Defendants breached their contractual duties to him as a shareholder and director of a corporation. The Court further finds that the Plaintiff did not prove by clear and convincing evidence that there was any fraud or material misrepresentation designed to induce Mr. Savoie to make the investment, and that Mr. Savoie did not rely on any statements of misrepresentation by either party to make the investment but he made the investment on his own as a perfectly mature, willing and knowledgeable person.
The Court finds for the Defendants on all counts as a matter of fact and as a conclusion of law.
A judgment may be entered consistent with this Decision.
[1] Tammy Emmett is also known as Tamera Emmett. *Page 1